J-A17008-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LIAM CROSBY | : | |
| | : | |
| Appellant | : | No. 2681 EDA 2022 |

Appeal from the Judgment of Sentence Entered September 15, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-SA-0000446-2022

BEFORE:  KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED AUGUST 22, 2023**

Liam Crosby (Crosby) appeals from the judgment of sentence imposed after his bench conviction of careless driving involving unintentional death[1] in the Court of Common Pleas of Montgomery County (trial court).  He argues that the evidence was insufficient to establish that he acted carelessly.  We affirm.

The factual and procedural background of this matter is not in significant dispute.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S. § 3714.

**I.**

The case commenced in the trial court when Crosby appealed his magisterial district court summary conviction. At the September 15, 2022 *de novo* summary appeal, the parties provided the court with the following stipulated facts.

**A.**

At the time of the subject September 7, 2021 incident, Crosby had been employed as a mechanic/service technician at the Nissan dealership located at 265 Lancaster Avenue, Lower Merion Township, Montgomery County, Pennsylvania for seven months. That day, in the early afternoon, Crosby was driving a customer's blue 2018 Nissan Armada performing a standard road test. He was in the parking lot of the Nissan dealership, which abutted Lancaster Avenue, a busy four-lane road, waiting to make a right-hand turn. When he did so, he struck Susan K. Simpson (d.o.b. 6/15/32) ("the victim") as she was crossing in front of the vehicle on the sidewalk. The victim died as a result of non-survivable head and neck injuries. (**See** Trial Court Opinion, 3/14/23, at 2); (Stipulations of Fact, 9/15/22, at ¶¶ 1, 6-9).

When police arrived at the scene, Crosby told them that he was turning right out of the dealership parking lot onto Lancaster Avenue and was stopped for ten seconds before turning due to oncoming traffic. He said that he was familiar with the area, saw people walking on the sidewalk every day and would travel his road-test route ten to fifteen times a day. He told the police

that he looked left and right to see traffic clear up and then made a right-hand turn onto Lancaster Avenue, got into the left lane and noticed a person in the roadway in his left side mirror. He pulled over, stopped the vehicle and ran back to where the victim was lying in the street. He reported that he never saw the victim prior to the crash and did not make any evasive maneuvers. (*See* Trial Ct. Op., at 2-3); (Stipulations, at ¶¶ 10-16).

Officer Charles Farrell is qualified in the field of crash reconstruction and examination, including but not limited to pedestrian crash reconstruction. At the time of the crash the roadway was dry, there was no inclement weather and it was cloudy with a temperature of approximately 80 degrees. (*See* Trial Ct. Op., at 3); (Stipulations, at ¶¶ 17-18).

The parties stipulated that if called to testify, the following individuals would testify to the following facts. Salimah Williams would state that she was in the Nissan dealership parking lot at around 11:07 a.m. on September 7, 2021, directly behind the blue SUV being driven by Crosby and did not observe a turn signal. Ms. Williams would testify that she saw the victim walking on the sidewalk approaching the blue SUV, at which point she lost sight of her. She saw the blue SUV turn right and she saw the victim lying on the ground. When the blue SUV immediately pulled over and stopped, Crosby ran back to where the victim was lying. Melanie Camp would state that she was travelling in the eastbound left lane of Lancaster Avenue approaching the Nissan dealership on her left when she saw an SUV make a right-hand turn

- 3 -

onto Lancaster Avenue. When the vehicle turned right, she saw the victim go to the ground "hard" and that she did not move. Cedric White would testify that he was the owner of the blue 2018 Nissan Armada that was being serviced for an oil change by the Nissan dealership on September 7, 2021. He would state that he did not observe fresh damage to the SUV after the incident, and that on the date of the incident, everything was in working order with no mechanical defects or issues that affected visibility, steering, braking or accelerating. Officer Michael Sullivan would state that he performed a road test on the blue 2018 Nissan Armada and there were no issues with the braking or steering of the vehicle. Finally, Aghyad Antonios, the general manager of the Nissan dealership, would state that he has worked for the dealership for several years and is aware of constant pedestrian traffic on the sidewalk in front of the dealership, with pedestrians frequently walking in front of vehicles leaving the parking lot onto Lancaster Avenue. (*See* Trial Ct. Op., at 3-4); (Stipulations, at ¶¶ 20-23, 25).

Finally, the parties stipulated that the victim's pants, videos from the Nissan dealership, photos and Google images were admissible. (*See* Trial Ct. Op., at 2, 4); (Stipulations, at ¶¶ 3-5, 24).

**B.**

At trial, the Commonwealth admitted the following evidence: three surveillance videos that contained footage of the incident; the policemen's post-accident body cams with audio that showed the victim and the vehicle

and contained an interview with Crosby; photographs of the vehicle and scene; and excerpts certified by the Pennsylvania Department of Transportation (PennDOT) from its Pennsylvania driver's manual describing a driver's duties upon turning from a stop at an intersection. Officer Farrell, the lead investigator in the case, was the only live witness at trial and was qualified as an expert witness in crash reconstruction. The trial court found that Officer Farrell's testimony was credible.

Officer Farrell testified that he is a 21-year veteran of the Lower Merion Township Police Department. He arrived on the scene of the incident within minutes of the crash and observed the vehicle Crosby had been driving parked on the street where he had left it and the victim lying where she had fallen. The officer narrated the video footage from the dealership's surveillant camera, which showed Crosby getting into the SUV and starting it, with the lights and brakes functioning normally. The video showed the vehicle driven by Ms. Williams pulling behind the SUV where Crosby had stopped while waiting to turn onto Lancaster Avenue. (*See* N.T. Summary Appeal, 9/22/15, at 5-8, 9-11).

Officer Farrell stated that it was common for pedestrians to come and go in both directions on the subject sidewalk. The surveillance video exhibited the victim walking into the picture from the right when the SUV Crosby was driving was facing the street, and another pedestrian coming from the left on the same sidewalk. He described the video's depiction of the victim making

her way toward the SUV from the right, crossing in front of it on the sidewalk, and the blue SUV pulling out and turning right onto Lancaster Avenue after waiting for a gray SUV to pass, striking the victim from the front. (*See id.* at 10-12).

Officer Farrell testified that approximately 21 seconds elapsed between Crosby's stopping at the intersection and his turning onto Lancaster Avenue. *Id.* at 13:5-12. About six seconds after the gray SUV passed and Crosby pulled out, the next car travelling in the same direction arrived at the intersection of the street and parking lot. *Id.* at 12:20-13:4. According to Officer Farrell's measurements, the victim was five feet and three inches tall, and was 11 inches taller than the hood of the Nissan Armada driven by Crosby so that her head and shoulders would have been visible to a driver. *Id.* at 13:13-23. The prosecution introduced into evidence the victim's pants and Officer Farrell identified a tire mark on the bottom left pant leg consistent with the video evidence. (*See id.* at 12-14 & Exhibit 3).

Officer Farrell described the digital footage from one officer's body cam which showed the victim lying on the sidewalk. Another officer's body cam footage contained an interview with Crosby in which he stated, "[t]hat he was only looking to the left the entire time." (*Id.* at 18). This video also showed that the passenger's side window of the vehicle Crosby had been driving was down. (*See id.* at 15-19 & Exhibits 2B, 2C).

Officer Farrell next identified a series of photographs taken of the vehicle at the time of the crash. *Id.* at 19-20 & Ex. 4A- I. The pictures showed that the vehicle's passenger's side window was down, the driver's side window was up and that there were no obstructions to the windshield or any of the SUV's controls. *Id.* at 20-22 & Ex. 4A-E. Officer Farrell testified that since Crosby was approximately six feet tall, the photos showed nothing that would have interfered with his ability to operate the vehicle or see over its hood. *Id.* at 21. Other photos showed clear lines of sight for both the victim and Crosby, with clear paths of unobstructed roadway and sidewalk. (*See id.* at 19-23 & Exhibits 4A-I).

According to a certified excerpt from the official state driver's manual read by Officer Farrell, "Drivers must yield to pedestrians when they are ... walking on a sidewalk crossing a driveway or alley ...." (*Id.* at 23-24; Pa. Dep't of Transp., Bureau of Driver Licensing, Pennsylvania Driver's Manual 48-49 (2021). When moving into and through an intersection to turn right, a driver must "Look left, straight ahead, right[] and then left again to make sure there is no traffic coming. Allow a gap of about eight (8) seconds between you and any vehicle approaching from the left." (N.T., at 24); (Trial Exhibit S at 49).

Officer Farrell testified that Crosby's stipulated statement to police that he was only stopped for ten second before turning "was inconsistent with the evidence because the video clearly shows it was longer than ten seconds."

(N.T., at 25); (*see also* Stipulations at ¶ 10). The officer testified that the stipulation that Crosby told police that he looked in both directions before turning right "was inconsistent with the evidence based on the officer's body cam video capturing Crosby saying he only looked left." (N.T. at 25); (*see also* Stipulations, at ¶ 13). Although Stipulation 14 represented that "Crosby stated to police that when he turned right he got into the left lane [and] noticed the person in the roadway in his left side mirror," the officer found this statement inconsistent with his review because "[t]he manner in which he pulled out of the driveway he exited almost into the left lane, it would have been virtually impossible to see anybody struck in his driver's side mirror." (N.T., at 26); (Stipulations, at ¶ 14). Finally, Officer Farrell testified that Crosby did not follow the driver's manual's directive with regards to looking in both directions and giving an eight second cushion when making a turn into traffic because "there was only six seconds between the other vehicle that came into view after he exited." (N.T., at 26).

"Based on [his] training, knowledge[,] and experience and [his] qualifications as an expert in the field of crash reconstruction," Officer Farrell opined that the victim's death "was [due to the] careless driving … of Mr. Crosby." (*Id.* at 26-27). The prosecutor completed direct examination of the officer by asking, "[T]o be clear, was this by failing to yield to a pedestrian on the sidewalk?" (*Id.* at 27). The officer and expert witness concluded, "It was." (*Id.*).

After cross-examining the officer, Crosby rested and proceeded directly to argument. Defense counsel argued that the evidence was insufficient because, although the Commonwealth had established ordinary negligence and Crosby's absence of care, "[t]he *mens rea* requirement applicable to Section 3714, careless disregard, implies less than willful or wanton conduct, but more than ordinary negligence or the mere absence of care under the circumstances." (*Id.* at 31). Although he conceded that Crosby is liable to the victim's estate for her death because he had a duty to see the victim and "missed her," he maintained that this was only ordinary negligence. (*Id.* at 34). The Commonwealth responded that it took the victim approximately 20 seconds to walk from where she was first seen on the video until she was in front of the SUV, with her shoulders and head clearly visible above the hood, and the fact that Crosby only looked left before turning into traffic despite being aware that pedestrians use the sidewalk in front of the dealership was careless driving that resulted in the victim's death. (*See id.* at 36). After taking a brief recess, the trial court returned, used the clock on its phone to demonstrate how long 21 seconds was between the time the victim was seen on the sidewalk and the SUV Crosby was driving struck her, and concluded that:

> [Crosby]'s statement that he never looked [right], considering the amount of time that he had ... to look right, had he looked right, he would have seen her. And the fact that he did not look right is more than just ordinary negligence, especially when you are in a high[-]traffic area with sidewalks in front of the dealership.

So after I did my own — in front of you as I did see how long [twenty-one] seconds [was], I do find [Crosby] was careless and I find on behalf of the Commonwealth.

(*Id.* at 43-44).

The court convicted Crosby of careless driving involving unintentional death, imposing a mandatory fine of $500 and costs. Crosby timely filed a notice of appeal and a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b).

Crosby raises one issue for our review: "Whether the trial court committed reversible error when it concluded that the evidence presented by the Commonwealth was sufficient to sustain a conviction for Careless Driving[.]"[2] (Crosby's Brief, at 3).

_____

[2] It is well-settled that:

Our standard of review from an appeal of a summary conviction heard *de novo* by the trial court is limited to a determination of whether an error of law has been committed and whether the findings of fact are supported by competent evidence. The adjudication of the trial court will not be disturbed on appeal absent a manifest abuse of discretion.

*Commonwealth v. Reigel*, 75 A.3d 1284, 1286-87 (Pa. Super. 2013) (citation omitted). "Evidence is sufficient if it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Coniker*, 290 A.3d 725, 733 (Pa. Super. 2023) (citation omitted). "A reviewing court views all the evidence from trial in the light most favorable to the Commonwealth as verdict winner, including the benefit of all reasonable inferences drawn from the evidence." *Id.* (citation omitted).

**II.**

Crosby argues that his conviction for careless driving resulting in unintentional death was not supported by sufficient evidence where it demonstrated that his actions demonstrated ordinary negligence.[3]

We are guided by the following legal principles.

**A.**

"Any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense." 75 Pa.C.S. § 3714(a). The Vehicle Code does not define what careless driving **is**, but instead describes what it is **not**. In other words, "[t]he *mens rea* requirement applicable to § 3714, careless disregard, implies less than willful or wanton conduct[4] but more than ordinary negligence or the mere absence of care under the circumstances." *Gezovich*, 7 A.3d at 301 (citations and internal quotation marks omitted).

A person acts negligently pursuant to Section 302(a) of the Crimes Code if he:

> … should be aware of a substantial and unjustifiable risk that the
> material element exists or will result from his conduct. The risk

---

[3] Crosby does not dispute that he caused the victim's death.

[4] Reckless driving, which has not been alleged here, requires a driver to drive in "willful or wanton disregard for the safety of persons or property." 75 Pa.C.S. § 3736. The primary difference between *mens rea* requirements for reckless driving and careless driving is that reckless driving is conscious disregard versus careless disregard for safety of persons or property. *See Commonwealth v. Bullick*, 830 A.2d 998, 1002 (Pa. 2003).

must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(4).

**B.**

Crosby maintains that "[w]hen the argument is framed, in the light most favorable to the government, [he] did not look to his right sufficiently to see the victim, in violation of the Pennsylvania Driver's manual[,]" which is "textbook negligence." (Crosby's Brief, at 12). In concluding that the Commonwealth's evidence was sufficient, the trial court relied in large part on ***Commonwealth v. Sanders***, 259 A.3d 524 (Pa. Super. 2021). (***See*** Trial Ct. Op., at 32-38).

In ***Commonwealth v. Sanders***, a bus driver was on a new route when she stopped at a red light to check paperwork to confirm the correct way to go. When the light turned green, she turned left into an intersection and inadvertently ran over and killed an elderly man who had been waiting at the corner and began to cross the street in the crosswalk when the light changed. We concluded the evidence was sufficient to support a conviction for careless driving where:

> Appellant had an unobstructed view of the intersection for at least 45 seconds before beginning to turn her vehicle. Nevertheless, she failed to notice the victim before commencing her left turn into the crosswalk because she was preoccupied with reading paperwork while stopped when the traffic light was red. By striking and killing the victim, she drove her vehicle in careless

- 12 -

disregard for the victim's safety and, in so doing, unintentionally caused the victim's death.

*Sanders*, 259 A.3d at 530.

The trial court relied on *Sanders* for its decision, explaining:

Crosby looked only left for the entire period of twenty-one seconds during which he had stopped the vehicle he was driving at the parking lot's intersection with the street, and never looked right or straight ahead to see the elderly pedestrian who had made her way on the sidewalk directly in front of the vehicle. [Crosby] knew from driving the same route numerous times over a seven-month period that people were constantly using the sidewalk during the hours he worked at the auto shop. Yet Crosby abruptly moved (the prosecutor said "jumped on the gas" (N.T., at 37)) into the intersection at the first break in the vehicular traffic he was intently watching to his left (which the investigating officer testified lasted only six seconds and not the eight seconds the PennDOT driver's manual requires for a safe turn into traffic (*see id.* at 26) without once bothering to look right or to the front of his car and consequently failing to notice the victim walking on the sidewalk, and striking and killing her as a result, in the officer's opinion, of "careless driving." (*Id.* at 26).

(Trial Ct. Op., at 36) (citation omitted; some formatting provided).

However, Crosby distinguishes *Sanders*, arguing that in that case, prior to her making a turn and striking the pedestrian, the bus driver was focused on an identifiable distraction (the papers), instead of the scene, whereas, here, Crosby was not distracted by any external factor. We disagree.

In both cases, the driver focused on one specific thing before turning into the street and striking the victim. Sanders focused on papers. Crosby focused solely on the oncoming traffic to his left. In both cases, the driver failed to pay attention to what sound driving and regard for human life required: a pedestrian passing in front of the vehicle in a place he or she was

- 13 -

legally entitled and would commonly be expected to be such that the driver was legally required to yield. Crosby's failure to do so was careless disregard sufficient to support a conviction for careless driving.

**C.**

Moreover, we are not legally persuaded by the cases Crosby distinguishes in support of his position. (**See** Crosby's Brief, at 9-10).

First, Crosby distinguishes **Commonwealth v. Abbazio**, 276 A.3d 210 (Pa. Super. filed Mar. 3, 2022) (unpublished memorandum), on the basis that in that case, the appellant driver was going 35 miles per hour through the intersection and operating a GPS device. (**See** Crosby's Brief, at 9-10). However, this is not persuasive where the Superior Court did not base its decision on either of those facts and, in fact, its reasoning supports the Commonwealth's position. The Court stated:

> Considering the fact that neither Appellant nor [the victim] was speeding, and at the time of the accident, "[i]t was daylight, it was clear, [and] there were no adverse conditions[,]" we conclude the Commonwealth presented sufficient evidence to establish Appellant acted in careless disregard for the safety of Schessler when he initiated a left turn as the motorcyclist approached, without sufficient time to avoid the collision.

**Abbazio**, 276 A.3d 210 at *6. Therefore, Crosby's attempt to distinguish **Abbazio** is not persuasive.

Next, Crosby distinguishes **Commonwealth v. Ford**, 141 A.3d 547 (Pa. Super. 2016), *appeal denied*, 164 A.3d 483 (Pa. 2016), on the basis that this Court found the evidence sufficient to support a careless driving conviction

because the appellant was traveling at 52 miles per hour in a 25 mile per hour zone and sped off from the ensuing traffic stop with the officer near his vehicle. (**See** Crosby's Brief, at 10). However, although the facts of **Ford** supporting the conviction were different than those present here, this does not render the facts in this case insufficient where there are myriad circumstances in which an individual can be guilty of driving carelessly.

Finally, Crosby relies on **Commonwealth v. Gilliland**, 422 A.2d 206 (Pa. Super. 1980). (**See id.**). However, **Gilliland** is inapposite to this matter where the issue before the Court was "whether the appellant's action was so negligent as to approach the level of recklessness or gross negligence required by statute for involuntary manslaughter, and whether his action constitutes reckless endangerment of the decedent." **Gilliland**, 422 A.2d at 207. Not only were these legal issues not present in this case, but the facts are also distinguishable where **Gilliland** involved a boating accident at 9:00 p.m., it was getting dark and there was no evidence about which boat had the right of way or about any other boating regulations. Conversely, here, it was a clear afternoon, Crosby violated the Vehicle Code by failing to look both ways and in front of him in the 21 seconds he waited before crossing what he knew was a heavily travelled pedestrian sidewalk involves "a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." 18 Pa.C.S. § 302(b)(4). Crosby's reliance on **Gilliland** is not legally persuasive.

For all the foregoing reasons, we conclude that the trial court did not commit an error of law or manifest abuse of discretion in convicting Crosby of careless driving resulting in inadvertent death; there was sufficient evidence to support the conviction.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2023